PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-3234 & 11-3262
_____

PACIFIC EMPLOYERS INSURANCE COMPANY

Appellant (No. 11-3262)

v.

GLOBAL REINSURANCE CORPORATION
OF AMERICA,
formerly known as Constitution Reinsurance Corporation,

Appellant (No. 11-3234)

_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-09-cv-06055)
District Judge:  Honorable Robert F. Kelly
_____

Argued June 19, 2012
_____

Before:  AMBRO, VANASKIE and VAN ANTWERPEN,
Circuit Judges

(Opinion filed: September 7, 2012)

Carter G. Phillips, Esq. (Argued)
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC   20005

William M. Sneed, Esq.
Jason M. Adler, Esq.
Sidley Austin LLP
One South Dearborn Street
Chicago, IL   60603

Ellen K. Burrows, Esq.
Christine Gellert Russell, Esq.
Brendan Mcquiggan, Esq.
White and Williams LLP
1650 Market Street
One Liberty Plaza, Suite 1800
Philadelphia, PA   19103

*Counsel for Pacific Employers Insurance Company*

Edward P. Krugman, Esq. (Argued)
S. Penny Windle, Esq.
Cahill, Gordon & Reindel LLP
80 Pine Street
New York, NY   10005

Bonny S. Garcha, Esq.
Mark G. Sheridan, Esq.
Bates Carey Nicolaides LLP
191 North Wacker Drive, Suite 2400
Chicago, IL  60606

William F. McDevitt, Esq.
Christie, Pabarue, Mortensen and Young
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA   19103

> *Counsel for Global Reinsurance*
> *Corporation of America*

_____

## OPINION OF THE COURT
_____

AMBRO, <u>Circuit Judge</u>

In 1980 Pacific Employers Insurance Company ("PEIC") purchased a certificate of reinsurance (the "Certificate") from Constitution Reinsurance Corporation ("Constitution"), the predecessor of Global Reinsurance Corporation of America ("Global").  In this case, one sentence from that Certificate stands in the spotlight.  That sentence reads, "As a condition precedent, the Company [*i.e.*, PEIC] shall promptly provide the Reinsurer [*i.e.*, Constitution, now Global] with a definitive statement of loss on any claim or occurrence reported to the Company and brought under this Certificate which involves a death, serious injury or lawsuit."

When we read this sentence in the context of the entire Certificate, we agree with the District Court that it is fairly susceptible to only one reasonable interpretation. PEIC must provide Global with a definitive statement of loss ("DSOL") on a subset of claims or occurrences, specifically those that involve a death, serious injury or lawsuit. When must PEIC do this? We believe it is promptly after someone reports such a claim or occurrence to it, not promptly after it demands indemnity from Global. If PEIC dawdles, the consequences can be severe. PEIC's compliance with this provision is a condition precedent to Global's duty to reinsure — that is, its duty to make indemnity payments relating to the underlying claim or occurrence — and not merely its duty to make such payments promptly.

Parting ways with the District Court, we hold that this provision is enforceable as written. Our choice-of-law analysis points to New York, not Pennsylvania, law. Under New York law, when a reinsurance contract expressly requires a reinsured to provide its reinsurer with prompt notice of a claim or occurrence as a condition precedent to coverage and the reinsured fails to do so, that failure excuses the reinsurer from its duty to perform, regardless whether the reinsurer suffered prejudice as a result of the late notice. For these reasons, and because no genuine issue of material fact remains, we reverse the District Court's Final Order and Judgment and remand with instructions that it enter a judgment of non-liability in Global's favor.

4

## I. Factual and Procedural Background

### A. Reinsurance Basics

A brief reinsurance primer is in order.[1] Put colloquially, reinsurance is insurance for insurance companies. A reinsurer agrees to indemnify a reinsured for certain payments the latter makes under one or more of its issued policies. In return, the reinsurer receives a share of the underlying premiums. Ceding a portion of an insured risk prevents a single catastrophic loss from hurling the reinsured into insolvency. It also allows the reinsured to invest more capital or to insure more risks.

The reinsured may be either a primary or an excess insurer. Both cover policy holders directly, but excess coverage kicks in only after an insured's primary coverage is exhausted. In contrast, reinsurers do not cover policy holders directly.[2] Instead, they issue "certificates" of reinsurance to their reinsureds.

---

[1] For a more comprehensive introduction to reinsurance, see *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143 (3d Cir. 2010); *British Ins. Co. of Cayman v. Safety Nat'l Cas.*, 335 F.3d 205 (3d Cir. 2003); *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194 (3d Cir. 1995); *Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 594 N.E.2d 571 (N.Y. 1992).

[2] A reinsurance certificate may contain a so-called "cut through" provision that grants insureds a direct right of action against the reinsurer. *See Jurupa Valley Spectrum, LLC v. Nat'l Indem. Co.*, 555 F.3d 87, 89 (2d Cir. 2009).

There are two basic types of reinsurance:  treaty and facultative.

> Under a reinsurance treaty, the reinsurer agrees to accept an entire block of business from the reinsured. Once a treaty is written, a reinsurer is bound to accept all of the policies under the block of business, including those as yet unwritten. Because a treaty reinsurer accepts an entire block of business, it does not assess the individual risks being reinsured; rather, it evaluates the overall risk pool.

> Facultative reinsurance entails the ceding of a particular risk or policy. Unlike a treaty reinsurer who must accept all covered business, the facultative reinsurer assesses the unique characteristics of each policy to determine whether to reinsure the risk, and at what price. Thus, a facultative reinsurer retains the faculty, or option, to accept or reject any risk.

*N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1199 (3d Cir. 1995) (internal citations and quotation marks omitted).

**B.    Buffalo Forge Purchases Insurance; PEIC Purchases Reinsurance**

Our story begins when the Buffalo Forge Company ("Buffalo Forge"), a manufacturing company located principally in Buffalo, New York, purchased insurance for itself and its affiliates.  First, it bought a "comprehensive general liability insurance policy" (the "Primary Policy") from Utica Mutual Insurance Company.  That policy had a $1 million limit.  It also purchased an "excess blanket catastrophe liability policy" (the "Excess Policy"), with the same policy period, from PEIC, then a California stock insurance company located in Los Angeles.  The Excess Policy provided $9 million of coverage in excess of the Primary Policy's $1 million.

Meanwhile, to spread some of the risk of the Excess Policy, PEIC purchased the Certificate (a facultative reinsurance contract) from Constitution, a New York corporation located in New York.  Under the Certificate, PEIC retained the first $1 million of the Excess Policy and Constitution agreed to reinsure 25% of the next $4 million, with a $1 million limit.

It does not appear that there was any direct "negotiation" over the Certificate's terms and conditions. While preparing to issue the Excess Policy, PEIC — through its Buffalo underwriting office — asked a broker in Minnesota to make inquiries about reinsurance coverage.  The broker then communicated with several reinsurers, including Constitution.  It sent a telex, dated May 30, 1980, to Constitution in New York to confirm that it was seeking binding reinsurance effective June 1, 1980, with PEIC retaining the first $1 million and Constitution reinsuring a 25% share of the next $4 million, in exchange for a $15,000 gross premium.  Constitution replied by telex on June 5,

7

1980, confirming its acceptance of PEIC's terms. The broker and Constitution had further exchanges in September 1980 about the payment of premiums and the issuance of the Certificate. Eventually Constitution caused the Certificate, according to its signature line, "to be signed by its President and Secretary at New York, New York," and sent it to PEIC's broker in Minnesota. In return, PEIC sent Constitution's share of the premiums from Buffalo Forge to PEIC's Minnesota broker, who forwarded it to Constitution in New York.

To offset further the risk of the Excess Policy, three other reinsurers also participated in Constitution's reinsured layer. Of the four, two were New York companies, one an Illinois company, and one a Massachusetts company.

Eighteen and nineteen years after the issuance of the Certificate, respectively, PEIC and Constitution underwent corporate reorganization. In 1998, Gerling Global Reinsurance Corporation acquired Constitution and merged it into a newly formed corporation that is now Global Reinsurance Corportion of America, the appellant here. Like its predecessor, Global is a New York corporation with its principal place of business in New York. PEIC underwent a more significant change in 1999. Previously a California company located in Los Angeles, that year PEIC became a Pennsylvania corporation with its primary place of business in Philadelphia.

### C. The Terms and Conditions of the Certificate

The Certificate is four pages long and does not contain an express choice-of-law provision. On the first page, Items 3 and 4 set out the amount of risk retained by PEIC (referred to as the Company) and the amount of reinsurance accepted

8

by Constitution (referred to as the Reinsurer). Specifically, they state:

> ITEM 3 - COMPANY RETENTION
>
> THE FIRST $1,000,000 SUBJECT TO FACULTATIVE REINSURANCE.
>
> ITEM 4 - REINSURANCE ACCEPTED
>
> $1,000,000 ANY ONE OCCURRENCE AND IN THE AGGREGATE WHERE APPLICABLE PART OF $4,000,000 WHICH IS EXCESS OF $1,000,000 WHICH IN TURN IS EXCESS OF UNDERLYING INSURANCE.

Item 5 indicates that Constitution's "Basis of Acceptance" is "Excess of Loss," which is later defined to mean that "[t]he limit(s) of liability of the Reinsurer, as stated in Item 4 of the Declarations (Reinsurance Accepted) applies(y) only to that portion of loss settlement(s) in excess of the applicable retention of the Company as stated in Item 3 of the Declarations."

The second page is titled "Reinsuring Agreements and Conditions." Significantly, the preamble on this page states the fundamental nature of the agreement:

> In consideration of the payment of the premium, and subject to the terms, conditions and limits of

9

> liability set forth herein and in the Declarations made a part thereof, the Reinsurer does hereby reinsure the ceding company named in the Declarations (herein called the Company) in respect of the Company's policy(ies) as follows:[.]

Following this first sentence, the second page outlines certain terms and conditions.

Paragraph A contains a "follow-the-fortunes" clause, linking PEIC's liability under the Excess Policy to Constitution's liability under the Certificate, and a "follow form" clause, importing into the Certificate the terms and conditions of the Excess Policy "except when otherwise specifically provided." It reads in relevant part:

> A. . . . The liability of the Reinsurer, as specified in Item 4 of the Declarations, shall follow that of the Company and shall be subject in all respects to all the terms and conditions of the Company's policy except when otherwise specifically provided herein or designated as nonconcurrent reinsurance in the Declarations . . . .

Paragraph D describes circumstances in which PEIC must provide Constitution with certain information about claims or occurrences reported to it under the Excess Policy. It also details Constitution's "right to associate." The paragraph states:

10

D. As a condition precedent, the Company shall promptly provide the Reinsurer with a definitive statement of loss on any claim or occurrence reported to the Company and brought under this Certificate which involves a death, serious injury or lawsuit. The Company shall also notify the Reinsurer promptly of any claim or occurrence where the Company has created a loss reserve equal to (50) percent of the Company's retention. While the Reinsurer does not undertake to investigate or defend claims or suits, it shall nevertheless have the right and shall be given the opportunity, with the full cooperation of the Company, to associate counsel at its own expense and to join the Company and its representatives in the defense and control of any claim, suit or proceeding involving this Certificate of Reinsurance.

Paragraph E explains how a loss settlement affects Constitution, how PEIC presents reinsurance bills, and how Constitution pays them. It provides:

E. All loss settlements made by the Company, provided they are within the terms and conditions of this Certificate of Reinsurance, shall be binding on the Reinsurer.

11

Upon receipt of a definitive statement of loss, the Reinsurer shall promptly pay its proportion of such loss as set forth in the Declarations. In addition thereto, the Reinsurer shall pay its proportion of expenses (other than office expenses and payments to any salaried employee) incurred by the Company in the investigation and its proportion of court costs and interest on any judgment or award, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment . . . .

The Certificate goes on to define the components of a DSOL, referred to in the first sentence of Paragraph D and the second of Paragraph E, as "those parts or portions of the Company's investigative claim file which in the judgment of the Reinsurer are wholly sufficient for the Reinsurer to establish adequate loss reserves and determine the propensities of any loss reported hereunder." *Id.*

## D. Buffalo Forge Gives Notice to PEIC; PEIC Gives Notice to Global

In the early 1990s, claimants across the country began inundating Buffalo Forge with asbestos-related lawsuits. It first notified PEIC, its excess carrier, of these claims and suits in April 2001. By 2004, Buffalo Forge's Primary Policy was exhausted. Beginning in October 2005, PEIC instructed its broker to keep its reinsurers informed about developments in the Buffalo Forge matter. PEIC asked its broker to forward

12

billings, notices, and updates to its reinsurers in 2006, 2007, and 2008, but apparently the broker failed to do so.

Instead, PEIC first told Global, having succeeded Constitution, about the Buffalo Forge matter in April 2008 when it sent a one-page claim report to Global's New York office. The report did not demand any payment from Global. It was not until more than a year later, in September 2009, that PEIC's payments under the Excess Policy exceeded its $1 million retention. Around that time, PEIC sent its first bill, dated September 2, 2009, for $559,071.67 to Global's New York office through PEIC's Minnesota broker. PEIC also emailed a copy directly to Global. Along with the billing, PEIC submitted supporting information and portions of its investigative claim file. On October 6, 2009, Global responded with a reservation-of-rights letter to PEIC's Philadelphia office that, among other things, requested additional information and disputed some areas of coverage. On November 2 and 4, 2009, Global audited PEIC's files at PEIC's offices in Philadelphia. During the audit, Global apparently discovered that PEIC first received notice of the Buffalo Forge matter in April 2001, yet PEIC did not notify Global of the Buffalo Forge situation until April 2008. In a November 11, 2009 letter, Global asserted a late-notice defense.

### E. The District Court Proceedings

In December 2009, PEIC sued Global for breach of contract, seeking $559,072 and a declaration of its rights. Global answered, denied liability, and asserted a counterclaim for its own declaratory relief. Specifically, it sought a declaration that it had no liability under the Certificate because PEIC failed to satisfy Paragraph D's DSOL requirement. In the alternative, it sought a declaration that the Certificate capped its maximum liability at $1 million,

13

*inclusive* of expenses. Global moved for a judgment on the pleadings on this issue, and the District Court agreed that the Certificate's $1 million limit is unambiguously inclusive of expenses.

In May 2011, the District Court denied Global's motion for summary judgment on the Certificate liability issue. *See Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am.*, No. 09-6055, 2011 WL 2003359 (E.D. Pa. May 23, 2011). The Court found that Paragraph D's DSOL provision unambiguously requires PEIC to provide Global with a DSOL promptly after Buffalo Forge reports a claim or occurrence involving a death, serious injury, or lawsuit to PEIC under the Excess Policy, not promptly after Buffalo Forge reports such a claim to PEIC *and* PEIC submits a claim for payment to Global under the Certificate. Further, the Court found that PEIC's compliance with Paragraph D's DSOL provision is unambiguously a condition precedent to Global's obligation to provide reinsurance coverage altogether, rather than simply a condition precedent to Global's obligation to remit payment promptly.

The Court also addressed whether Paragraph D's DSOL provision is enforceable as written. Global claimed that New York law applied while PEIC insisted that Pennsylvania law did. The Court acknowledged, as the parties agreed, that under New York law when a reinsurance contract expressly sets prompt notice as a condition precedent to coverage, a court will enforce the condition as written and not require the reinsurer to prove prejudice in the event of late notice. As there was no holding from the Supreme Court of Pennsylvania directly on point, the District Court "predict[ed] that the Pennsylvania Supreme Court would hold [contrary to New York law] that a reinsurer must prove prejudice to avoid coverage even where the cedant breached a notice condition that is a condition precedent." Confronted with a true

14

conflict, the Court conducted a choice-of-law analysis and concluded that Pennsylvania's predicted must-show-prejudice rule applied. Because Global failed to allege facts to support a finding of prejudice, the Court ruled that Global could not succeed under Pennsylvania law.

After the denial of Global's motion for summary judgment, the parties agreed that there were no issues left for trial and stipulated to entry of a final judgment that embodied the Court's rulings. The Final Order and Judgment decrees that PEIC shall recover from Global $507,926 plus interest and that Global must pay all future billings under the Certificate up to $1 million, inclusive of expenses.

PEIC appeals the District Court's interpretation of Paragraph D's DSOL provision and Global challenges the District Court's prediction of Pennsylvania law and its choice-of-law analysis. PEIC also appeals the Court's limit-of-liability ruling.[3]

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1). We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's denial of summary judgment embedded in its stipulated Final Order and Judgment *de novo* and apply the same standard the District Court applied. *See Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011). We will reverse if "there is no genuine dispute as to

---

[3] Because Global is entitled to a judgment of non-liability as a result of our holding, PEIC's limit-of-liability appeal is moot. Thus we have no occasion to consider the Second Circuit's decision in *Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910 (2d Cir. 1990), which PEIC asserts is much maligned in the reinsurance industry.

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.  Interpreting Paragraph D's DSOL Provision

### A.  Rules of Interpretation

The division of labor between court and fact-finder when interpreting a contract, and the basic rules of interpretation, are well established and do not differ between New York and Pennsylvania.  First, we must determine (as a matter of law) whether contractual language is ambiguous. *See Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998); *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986).  If we determine that the language is unambiguous, we follow its plain meaning.  If, however, we conclude that the language is ambiguous, we leave it to a fact-finder to decide its meaning.  *See Ins. Adjustment Bureau, Inc. v. Allstate Ins., Inc.*, 905 A.2d 462, 469 (Pa. 2006); *Amusement Bus. Underwriters v. Am. Int'l Grp., Inc.*, 489 N.E.2d 729, 732 (N.Y. 1985).

A contract is ambiguous only if it is "written so imperfectly that it is susceptible to more than one reasonable interpretation."  *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011); *see also Ins. Adjustment Bureau*, 905 A.2d at 468-69.  The mere fact that the parties do not agree on the proper construction does not make a contract ambiguous. *See Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 (Pa. Super. Ct. 1984).

Because "the law does not assume that the language of the contract was chosen carelessly," that language is of paramount importance.  *Meeting House Kane, Ltd. v. Melso*, 628 A.2d 854, 857 (Pa. Super. Ct. 1993).  "The parties have a right to make their own contract, and it is not the function of

the court to rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used." *Bombar v. W. Am. Ins. Co.*, 932 A.2d 78, 99 (Pa. Super. Ct. 2007). This is not to say that we can be overly myopic. When determining whether a contract is ambiguous, we must "examine the entire contract" and "[p]articular words should be considered, not as if isolated from the context, but [rather,] in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Kass*, 696 N.E.2d at 180-81 (quoting *Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418, 418 (N.Y. 1927)). In this regard, "all provisions in the agreement will be construed together and each will be given effect" because a court "will not interpret one provision . . . in a manner which results in another portion being annulled." *Lesko v. Frankford Hosp. Bucks-County*, 15 A.3d 337, 342 (Pa. 2011).

## B. PEIC's Duty to Provide a DSOL Promptly

We begin our merits analysis with some common ground. Recall that Paragraph D's first sentence provides: "As a condition precedent, [PEIC] shall promptly provide [Global] with a definitive statement of loss on any claim or occurrence reported to [PEIC] and brought under this Certificate which involves a death, serious injury or lawsuit." Whatever PEIC's obligation might be, it clearly only applies to (1) a "claim or occurrence," (2) that is "reported to [PEIC]," and (3) that "involves a death, serious injury or lawsuit."

Although the Certificate does not define "claim" or "occurrence," the parties appear to agree on their meaning. A "claim," at least as relevant here, is generally a demand for payment or relief made against the persons or entities covered by the Excess Policy or a similar demand made against PEIC. An "occurrence" is defined under the Excess Policy as "an

17

accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the insured." J.A. 122. The Certificate does not specify who must "report[] to" PEIC the referenced claims or occurrences. But surely the phrase "claim or occurrence reported to [PEIC]" refers to a claim or occurrence that PEIC's insureds or their representatives report to it under the Excess Policy.

Disagreement begins when we consider *when* PEIC must remit a DSOL under Paragraph D. Global says it is promptly after an insured reports a claim or occurrence involving a death, serious injury, or lawsuit to PEIC under the Excess Policy. PEIC says it is promptly after it demands payment from Global under the Certificate.

The dispute turns, in large part, on the words "and brought under this Certificate." According to Global, a claim or occurrence is "brought under this Certificate" if it is swept within the general scope of the Certificate's reinsurance coverage, or, put differently, if it is among the types of claims or occurrences that the Certificate generally covers. The District Court agreed. *See Pac. Emp'rs Ins. Co.*, 2011 WL 2003359 at *5 (finding that the phrase "claim or occurrence . . . brought under this Certificate" means "that which its plain meaning confers upon it, merely those types of claims which fall under Global's reinsurance coverage"). As such, Paragraph D does not require PEIC to provide a DSOL for any claim or occurrence of a type that the Certificate does not cover. For example, two pages of the Certificate are devoted to excluding from reinsurance coverage certain losses and liabilities relating to "nuclear energy risks." *See* J.A. 77.2-.3 (clause titled "NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY – REINSURANCE"). If a claim or occurrence were reported to PEIC under the Excess Policy that is excluded from the Certificate by the nuclear incident

18

clause, then Paragraph D would not require PEIC to provide Global with a DSOL on that claim or occurrence because it is not "brought under this Certificate." Importantly, as Global sees it, whether a claim or occurrence is "brought under this Certificate" can and must be determined at the time it is reported to PEIC.

PEIC disagrees, and argues that a "claim or occurrence" is "brought under this Certificate" only when it seeks an indemnity payment from Global related to the claim or occurrence. Here, PEIC did not seek payment from Global until September 2009.[4] Thus, no claim or occurrence was "brought under this Certificate" before then and PEIC had no duty to provide Global a DSOL.

In a brief, unsigned "summary order," the Court of Appeals for the Second Circuit — examining provisions identical to the first sentence of Paragraph D — held that the "terms of the reinsurance certificates create ambiguity as to what event triggers the duty to promptly provide a DSOL." *Folksamerica Reinsurance Co. v. Republic Ins. Co.*, No. 04-2716-CV, 182 Fed. Appx. 63, 64 (2d Cir. May 26, 2006). If we were to isolate Paragraph D's first sentence and consider nothing else, we might agree. But when we read that sentence in the context of the Certificate as a whole, examining its structure and other provisions, we are convinced that Global's reading is the correct one.

But even before we turn to the Certificate's other provisions, we see that PEIC's reading creates problems within Paragraph D's first sentence. As noted, that sentence is not limited to "claim[s]" reported under the Excess Policy,

---

[4] Global neither concedes nor contests that the materials PEIC sent in September 2009 were sufficient to meet the Certificate's definition of a DSOL.

19

but rather expressly applies to "claim[s] *or occurrence[s].*" This confirms that the obligation it imposes comes into play before PEIC demands payment under the Certificate. Occurrences (accidents) exist apart from claims (demands for relief). While some occurrences may ripen into one or more claims, others may not. If (as PEIC suggests) Paragraph D's DSOL provision applies only after PEIC demands payment from Global, such a reading becomes nonsensical as applied to occurrences because it would require a DSOL for an occurrence only after it became a claim. In other words, if we accept PEIC's reading, the words "or occurrences" in the Certificate would be superfluous. *See Capek* v. *Devito*, 767 A.2d 1047, 1050 (Pa. 2001) ("[A]n interpretation will not be given to one part of the contract that will annul another part of it.") (quotation marks omitted); *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 679 N.E.2d 1044, 1047-48 (N.Y. 1997) ("[C]ourts, in interpreting policies, should strive to give meaning to every sentence, clause, and word of a contract of insurance.") (quotation marks and alterations omitted).

Moving to the second sentence of Paragraph D, we find a second notice obligation that further illuminates the purpose served by the Paragraph's first notice obligation, the DSOL provision. This sentence moves beyond the subset of claims or occurrences — those "involving a death, serious injury or lawsuit" — covered in the first sentence, and instead reaches "any" claim or occurrence. It provides that PEIC "*shall also notify* [Global] promptly of *any* claim or occurrence where [PEIC] has created a loss reserve of fifty (50) percent of [PEIC's] retention specified in Item 3 of the Declarations." *Id.* (emphases added). Unlike the first sentence of Paragraph D, the second sentence does not require PEIC to report a subset of claims or occurrences immediately after Buffalo Forge reports them under the Excess Policy. Instead, PEIC must report all claims or

20

occurrences when it creates a loss reserve of 50% ($500,000) of its $1 million retention. Furthermore, when it notifies Global that it has reserved beyond the $500,000 trigger point, PEIC does not have to provide a DSOL.

A logical insurance purpose surfaces for the disparate treatment of those claims or occurrences that involve "a death, serious injury or lawsuit" and those that do not. As noted, under the Certificate PEIC retained the first $1 million of exposure on its Excess Policy. Thus, some claims or occurrences reported to PEIC under that policy may be of no concern to Global because they may not reach into Global's reinsured layer. If a reinsurer had to determine for itself whether any particular underlying claim or occurrence could potentially affect it, the system of reinsurance would not work efficiently. *See Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993) ("Reinsurance works only if the sums of reinsurance premiums are less than the original insurance premium. . . . For the reinsurance premiums to be less, reinsurers cannot duplicate the costly but necessary efforts of the primary insurer in evaluating risks and handling claims. Reinsurers may thus not have actuarial expertise, or actively participate in defending ordinary claims.") (citation omitted).

Paragraph D deals with the disparate treatment issue by setting up for Global the right to divide the labor between it and PEIC. When a claim or occurrence carries certain indicia of potential seriousness — namely, the involvement of "a death, serious injury or lawsuit" — Global contracted for the right to assess for itself whether the matter might develop into something so significant that it could activate its reinsured layer. In the absence of such potentially serious claims or occurrences, Global chose to rely on PEIC's judgment, but with the agreement that after PEIC concludes that Global's layer is in danger of being breached — by

21

setting reserves for itself of 50% of its retention — it must notify Global of any claim or occurrence reported regardless whether it involves a death, serious injury or lawsuit.

Why would a reinsurer want to receive a DSOL on a potentially serious claim or occurrence when it is first reported to its reinsured rather than when its reinsured demands indemnity? We discern two reasons. First, as its definition makes clear, a DSOL allows a reinsurer to "establish adequate loss reserves and determine the propensities of any loss reported" under the Certificate. Allowing PEIC to wait until it actually demands payment under the Certificate undermines this fundamental purpose. "[E]stablish[ing] adequate loss reserves and determin[ing] the propensities of any loss reported" are anticipatory measures that allow a reinsurer to forecast and prepare for future losses and to allocate funds for possible payment. Taking these steps after PEIC demands payment under the Certificate would make little sense.[5] Second, Global may wish to

---

[5] PEIC raises a side issue about the definition of a DSOL. It argues that the DSOL requirement is an "illusory" promise. To be sure, the information required in a DSOL includes a discretionary element — the information PEIC submits must be "in the judgment of [Global] . . . wholly sufficient" for Global to set reserves. But the inclusion of a discretionary element in a standard of performance does not render the standard meaningless or unenforceable: PEIC and Global must exercise their judgment reasonably and in good faith, and their determinations are subject to review in any subsequent litigation. *See Dalton* v. *Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) ("Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that

22

exercise its "right to associate," as guaranteed by the third sentence of Paragraph D. Permitting PEIC to submit a DSOL only after it actually demands payment under the Certificate could wipe out Global's contractual right to associate in the defense and control of claims as they develop. In that case, Global may not receive notice of a claim until PEIC has already handled it, depending on whether PEIC created a 50%-of-retention reserve and notified Global accordingly.

Paragraph E imposes another DSOL obligation that, contrary to PEIC's suggestion, fails to undermine Global's interpretation. That Paragraph provides that

> [a]ll loss settlements made by [PEIC], provided they are within the terms and conditions of the original policy(ies) and within the terms and conditions of this Certificate of Reinsurance, shall be binding on [Global]. Upon receipt of a definitive statement of loss, [Global] shall promptly pay its proportion of such loss as set forth in the Declarations.

As PEIC acknowledges, under this provision it must remit a DSOL when it demands that Global pay the latter's proportion of losses under the Certificate, regardless whether the underlying claim involved a death, serious injury, or lawsuit. But this begs the question: If Paragraph E requires PEIC to send Global a DSOL when PEIC demands any indemnity for loss payments under the Certificate, then why does Paragraph D also require a DSOL for a subset of

discretion."); *Germantown Mfg. Co.* v. *Rawlinson*, 491 A.2d 138, 148 (Pa. Super. 1985).

23

particularly serious underlying claims? The only reasonable interpretation is that the paragraphs impose two different obligations that arise at different times. Thus, under Paragraph D, PEIC must *first* promptly provide Global with a DSOL on a subset of claims or occurrences — those involving "a death, serious injury or lawsuit" — promptly after they are reported. Then, under Paragraph E, PEIC must later submit a DSOL when it demands any payment from Global under the Certificate. If, at that time, PEIC is demanding payment related to an underlying claim that involves a death, serious injury, or lawsuit, then it should be submitting a DSOL for the second time. If the Certificate only required PEIC to submit a DSOL when it seeks payment under the Certificate, the first sentence of Paragraph D would simply be surplusage. To interpret the contract that way would violate a cardinal rule of contractual interpretation that counsels against rendering words or provisions meaningless. *See Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007); *Morris v. Am. Liab. & Sur. Co.*, 185 A. 201, 202 (Pa. 1936).

After a close examination of the Certificate's other provisions, a big-picture look at the Paragraph D DSOL provision's place in the Certificate's overall structure confirms our interpretation. The Certificate's terms and conditions move sequentially through the life of the reinsurance relationship. First, Paragraphs A, B, and C establish the reinsurance relationship itself. Next, Paragraph D describes PEIC's duties and obligations from the moment it receives notice of a claim or occurrence under the Excess Policy through the investigation of such a claim and the defense of any lawsuit. Then, Paragraph E details how, if an underlying claim is resolved by PEIC, it presents reinsurance bills to Global and how Global pays them. This structure suggests that the first sentence of Paragraph D — because it appears in Paragraph D (which addresses the notice and

development of claims) and not Paragraph E (which addresses the presentation and payment of reinsurance bills) — must create an obligation that is triggered at the time PEIC receives notice of an underlying claim or occurrence.

After considering every provision of the Certificate and how they fit together, we conclude that Paragraph D unambiguously requires PEIC to provide Global with a DSOL on any claim or occurrence that involves a death, serious injury or lawsuit promptly after such a claim or occurrence is reported to it under the Excess Policy.

### C. The Consequences for Breach

Having decided what event triggers PEIC's obligation to provide a DSOL under Paragraph D, we turn to what consequences the Certificate provides for a failure to comply with that obligation. The District Court found that "the only reasonable interpretation" of "[a]s a condition precedent" in the first sentence of Paragraph D is that it creates a prerequisite to Global's duty to provide reinsurance coverage. *Pac. Emp'rs Ins. Co.*, 2011 WL 2003359 at *4.[6] Therefore, if PEIC does not comply with the DSOL provision, then (under

---

[6] By way of background, a condition precedent — often referred to simply as a condition — is generally "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." *Restatement (Second) of Contracts* § 224; *see also Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 739 A.2d 133, 139 (Pa. 1999) ("Where a condition has not been fulfilled, the duty to perform the contract lays dormant and no damages are due for non-performance.") (quotation marks omitted).

the terms of the Certificate) Global is not only excused from its obligation to remit payment promptly, but it is excused from its obligation to remit payment at all.

Admittedly, the condition precedent phrase could have been drafted more clearly. It might have provided, for example, that "As a condition precedent to any liability on the part of Global under this Certificate, . . . ." But a contract does not have to be perfect to be unambiguous. Global's interpretation is, we believe (as did the District court), the only reasonable one.

To begin, the preamble makes reinsurance coverage, not just Global's duty to remit payment promptly, subject to the Certificate's conditions. Specifically, it provides that Global "does hereby reinsure" PEIC "subject to the terms, conditions, and limits of liability set forth herein." Paragraph D's "condition precedent" — PEIC's obligation to remit a DSOL — is undeniably a "condition[] set forth" in the Certificate. Thus, PEIC's failure to comply with that condition excuses Global from its promise to "hereby reinsure" it under the Certificate.

When reading the first sentence of Paragraph D in context, it becomes even clearer that the consequences for failing to comply with it must be different in kind than the consequences for failing to comply with other provisions in the Certificate. No other provision in the Certificate uses "condition precedent" language. For example, Paragraph D's second provision makes no mention of a "condition precedent," and simply provides that "[PEIC] shall also notify [Global] promptly of any claim or occurrence where [PEIC] has created a loss reserve equal to (50) percent of [PEIC's] retention." Thus, while Paragraph D's first sentence creates a condition precedent to coverage, the second (like all other

26

provisions in the Certificate) is an ordinary contractual covenant the breach of which may entitle Global to damages but does not automatically forfeit coverage.

Finally, if the "as a condition precedent" language did anything other than create a condition precedent to coverage, PEIC could simply wait until presenting a bill for payment under the Certificate before submitting its first DSOL without repercussion, and thereby eviscerate Global's other contractual rights. In that case, Global would lose its "right to associate" and its right to forecast adequate loss reserves and determine the propensity of losses when serious claims or occurrences are reported.

## IV. Conflicts Analysis

We consider next whether the applicable state law would either (1) enforce the express condition precedent as written or (2) require Global to prove that it suffered prejudice from any late DSOL remittance. Global argues that New York law applies, and that it would enforce the Certificate as written without requiring proof of prejudice. PEIC counters that Pennsylvania law applies, and that it would require Global to prove prejudice. We agree with Global.[7]

---

[7] As a preliminary matter, PEIC insists that Global has waived its argument that New York law applies. We disagree. The most cursory of glances at the District Court's opinion reveals that this is not so. The Court mentioned that "Global argues that New York law should apply, which does not require a reinsurer to demonstrate prejudice resulting from late notice but that, in any event, Pennsylvania and New York law do not conflict on this point." 2011 WL 2003359 at

27

## A. The Applicable Choice-of-Law Rules

As a federal court sitting in diversity, we apply the choice-of-law rules of the forum state, which is Pennsylvania in this case. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 170-71 (3d Cir. 2011). "Pennsylvania applies the . . . flexible, 'interests/contacts' methodology to contract choice-of-law questions." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226-27 (3d Cir. 2007).

When a contract like the Certificate does not contain an express choice-of-law provision (or indicate that the parties implicitly agreed to be bound by a particular state's law), the first step in the analysis is to identify the jurisdictions whose laws might apply. *Id.* at 230. As candidates, the parties offer New York and Pennsylvania. Next, we must determine the substance of these states' laws, and look for actual, relevant differences between them. *Id.* "If [the] two jurisdictions' laws are the same, then there is no *conflict* at all, and a choice of law analysis is unnecessary."

---

*6. The Court goes on to devote half of its opinion to the choice-of-law issue. *Id.* at *5-*10. Although we disagree with the Court's analysis, we cannot pretend that it does not exist. Furthermore, it is an open question whether choice-of-law issues are waiveable in this Circuit. *See Huber v. Taylor*, 469 F.3d 67, 75 n.12 (3d Cir. 2006) (noting that we "have not adopted a consistent rule regarding whether choice of law issues are waiveable," and discussing cases in which we "held that choice of law questions cannot be waived" and another in which "we considered the choice of law question waived"). As we did in *Huber*, we decline to resolve this tension because Global did not waive its argument, even assuming that it is waiveable.

28

*Id.* (emphasis in original). If there are actual, relevant differences between the laws, then we "examine the governmental policies underlying each law, and classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation." *Id.* "A deeper choice of law analysis is necessary only if *both* jurisdictions' interests would be impaired by the application of the other's laws (*i.e.*, there is a true conflict)." *Id.* (quotation marks and alteration omitted) (emphasis in original).

## B. New York Law

The law of New York is not in dispute. When a reinsurance contract expressly requires a reinsured to provide its reinsurer with prompt notice of a claim or occurrence as a condition precedent to coverage and the reinsured fails to do so, that failure excuses the reinsurer from its duty to perform, even if it did not suffer prejudice as a result of the late notice. To understand New York's interests in having this rule apply here, a brief account of the rule's development is necessary.

In *Unigard Security Insurance Co. v. North River Insurance*, 594 N.E.2d 571 (N.Y. 1992), the Court of Appeals of New York addressed how courts should interpret a prompt notice provision that is *not* explicitly a condition precedent to coverage. At that time, New York courts had long applied a "settled" rule of construction to primary insurance contracts: the notice provision "operates as a condition precedent and . . . the insurer need not show prejudice to rely on the defense of late notice." *Id.* at 573. They recognized this as a "limited exception to two established rules of contract law: (1) . . . ordinarily one seeking to escape the obligation to perform under a contract must demonstrate a material breach or prejudice; and (2) . . . a contractual duty ordinarily will not be construed as a condition precedent absent clear language

29

showing that the parties intended to make it a condition." *Id.* (citations omitted).

Before considering whether this no-prejudice-required exception should apply in the reinsurance context, the *Unigard* Court made clear that it was addressing the issue in the context of the contract before it. *Id.* at 574. The contract in that case required the reinsured to provide "prompt notice . . . of any occurrence or accident which appear[ed] likely to involve th[e] reinsurance," but it did not use the words "condition precedent" or any other words indicating an intent to create a condition precedent. *Id.* at 572. The Court noted that "[t]here is nothing in [the notice provision or elsewhere in the contract] indicating that the parties intended that the giving of notice should operate as a condition precedent. If ordinary rules of contract were applied, the prompt notice provision in the . . . certificate would not be construed as a condition precedent." *Id.* at 573-74 (citation omitted).

With this caveat in mind, the Court pointed to differences between primary insurance and reinsurance, and held that a reinsurer must demonstrate how any late notice caused it prejudice before coverage could be excused. *Id.* at 575. It considered prompt notice to be "of substantially less significance for a reinsurer than for a primary insurer" because "[a] reinsurer is not responsible for providing a defense, for investigating the claim or for attempting to get control of the claim in order to effect an early settlement." *Id.* at 574. And although late notice may impair a reinsurer's "right to associate," the Court found that such a risk was not "sufficiently grave to warrant applying a presumption of prejudice." *Id.*

The Court of Appeals for the Second Circuit has confirmed that *Unigard*'s must-show-prejudice rule is a default rule of contract construction that parties may contract

around with an express condition precedent. *See Christiana Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992). Citing *Unigard*, the Second Circuit noted that "[f]or a reinsurer to be relieved from its indemnification obligations because of the reinsured's failure to provide timely notice, *absent an express provision in the contract making prompt notice a condition precedent*, it must show prejudice resulted from the delay." *Id.* at 274 (emphasis added); *see also Constitution Reinsurance Corp. v. Stonewall Ins. Co.*, 980 F.Supp. 124, 130-31 (S.D.N.Y. 1997), *aff'd mem. on opinion below*, 192 F.3d 899 (Table) (2d Cir. 1999).

New York's rule is rooted in freedom of contract. "An express contract for indemnity," like the Certificate, "remains a contract[;] [h]ence, the parties are free, within limits of public policy, to agree upon conditions precedent to suit." *Constitution Reinsurance Corp.*, 980 F.Supp. at 131 (quoting *Continental Cas. Co. v. Stonewall Ins. Co.*, 77 F.3d 16, 19 (2d Cir. 1996)).

### C. Predicting Pennsylvania Law

The parties do not agree on the law of Pennsylvania. This is hardly surprising because the Supreme Court of Pennsylvania has not addressed (1) how a court should interpret a prompt notice provision in a reinsurance contract that is not an express condition precedent to coverage or (2) whether parties may contract around a default must-show-prejudice rule with an express condition precedent.

In the absence of a controlling opinion from a state's highest court on an issue of state law, we typically predict how that court would decide the issue. *See Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000). When predicting state law, we "can . . . give due regard, but not conclusive effect, to the decisional law of lower state courts."

31

*Id.* But "[t]he opinions of intermediate appellate state courts are 'not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Id.* (quoting *West v. AT&T Co.*, 311 U.S. 223, 237 (1940)).

The District Court began with the Supreme Court of Pennsylvania's decision in *Brakeman v. Potomac Ins. Co.*, 371 A.2d 193 (Pa. 1977). That case addressed late notice in the primary insurance context, but — unlike *Unigard* — it did not announce a default rule of construction; it went further. *Brakeman* held that, under a liability insurance policy, late notice will not relieve an insurer of its coverage obligations unless it proves that breach of the notice provision caused it prejudice. *Id.* at 198. The Court made no exception for policies that make prompt notice an express condition precedent to coverage. In fact, the policy at issue provided that "[n]o action shall lie against [the insurer] unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of th[e] policy." *Id.* at 195. Thus, under *Brakeman* public policy trumps notice provisions that are express conditions precedent to coverage.

The *Brakeman* Court jettisoned its insistence on "the freedom of private contracts" in this context for two reasons. *Id.* at 196. First, "an insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured." *Id.* Specifically, "an insured is not able to choose among a variety of insurance policies materially different with respect to notice requirements, and a proper analysis requires this reality to be taken into account." *Id.* Second, it would be "unfair to insureds," and "unduly severe and inequitable," to allow an insurance company to accept the insured's premiums and then seek to deny coverage "unless a sound reason exists for doing so." *Id.* at 196-98. A notice provision is not meant "to

32

provide a technical escape-hatch by which to deny coverage." *Id.* at 197 (quotation marks omitted).

Only one Pennsylvania case, *Ario v. Underwiting Members of Lloyd's of London Syndicates*, 996 A.2d 588, 598 (Pa. Cmwlth. Ct. 2010), even mentions the prejudice issue in the reinsurance context. There, the Commonwealth Court devoted only two sentences to the law on point:

> [T]he "notice-prejudice" rule applies in both Pennsylvania and New York. *See Brakeman v. Potomac Ins. Co.*, 371 A.2d 193 (1977); *see also Unigard Sec. Ins. Co. v. North River Ins. Co.*, 594 N.E.2d 571 (1992). Under this rule, unless the insurer establishes prejudice resulting from the insured's failure to give notice as required under the policy, the insurer cannot avoid its contractual obligation. *Brakeman*, 371 A.2d at 198. *Unigard*, 594 N.E.2d at 573.

*Id.*[8] The Court could not decide whether the reinsurer was prejudiced on the record before it; thus, it denied summary judgment. *Id.* Further diluting any guidance the case offers, the reinsurance agreement at issue did not contain an express condition precedent. In fact, it did not contain any notice requirement at all; the reinsurer argued that the "follow form" provision incorporated the notice requirements from the underlying direct policy. *Id.* at 591, 598.

---

[8] As our discussion above demonstrates, *Ario*'s account of New York law is incomplete.

33

Global correctly points out that, under Pennsylvania law, the invalidation of contract provisions on public policy grounds is a rare and significant exercise of judicial power.

> In the absence of a plain indication [that a contract provision is contrary to public policy] through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts contrary to public policy. The courts must be content to await legislative action.

*Heller v. Pa. League of Cities & Municipalities*, 32 A.3d 1213, 1220-21 (Pa. 2011) (quotation marks and alteration omitted).

> It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring [that the contract provision is against public policy].

*Id.* at 1221 (quotation marks omitted).

Still, we suspect that Pennsylvania's interest in preventing technical forfeitures of coverage drops a heavy

counterweight. In the primary insurance context, we have recognized that "the *Brakeman* rule applies even to policies between sophisticated parties." *Trustees of the Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 897 (3d Cir. 1987). In *Trustees,* we discerned that "although a sophisticated consumer has greater power and experience with which to negotiate individual terms of an insurance policy, . . . *Brakeman* rested above all on the court's unwillingness to permit a forfeiture of insurance protection 'unless a sound reason exists for doing so.'" *Id. Trustees*, however, did not involve a notice requirement expressed as a condition precedent. In fact, we made clear that we were *not* deciding "whether Pennsylvania courts would enforce an explicit waiver of *Brakeman's* protection by a sophisticated insured." *Id.* at 897 n.2.

Our suspicion about Pennsylvania law is further enhanced by our prediction that "under *New Jersey* law . . . a reinsurer must show prejudice in order to prevail on a late notice defense asserted against its reinsured." *British Ins. Co. of Cayman v. Safety Nat'l Cas.*, 335 F.3d 205, 207 (3d Cir. 2003) (emphasis added).[9] In that case, we acknowledged that the contract-of-adhesion rationale for a must-show-prejudice rule does not apply as strongly in the reinsurance context, but concluded that the fairness rationale does, and ultimately this carries the day. Admittedly, reinsurance contracts "do not bear all the indicia of adhesion endemic in contracts for

---

[9] The notice provision at issue in *British Insurance*, however, did not include condition-precedent language. *Id.* at 207. As a result, we had no occasion to consider whether parties could overcome the must-show-prejudice rule with an express condition precedent to coverage. Still, the decision provides some insight as to how the Supreme Court of Pennsylvania might decide the issue before us.

primary coverage;" and they are "clearly more in the nature of indemnity agreements between two sophisticated insurance companies." *Id.* at 213. Nonetheless "[t]he New Jersey Supreme Court clearly frowns upon literal interpretation of notice provisions in situations where it results in the insured forfeiting coverage it has already paid for absent some countervailing consideration (such as prejudice) on the part of the insurer that has accepted premiums in return for offering coverage." *Id.* at 213. For that reason, we predicted New Jersey law would still require a showing of prejudice in reinsurance cases.

*British Insurance* is consistent with "the differences in the contractual undertakings of primary insurers and reinsurers because notice provisions are significantly less important to the reinsurer than a primary insurer." *Id.* Notice of claims and occurrences in the primary insurance context "afford[s] the insurer an opportunity to form an intelligent estimate of its liabilities, to afford it an opportunity to investigate the claim while witnesses and facts are available and to prevent fraud and imposition upon it." *Id.* at 213 (quotation marks omitted). In the reinsurance context, it is the sole obligation of the ceding insurer to investigate, litigate, settle, or defend claims and, while the reinsurer may have a "right to associate," we considered that right (especially since it is rarely exercised) insufficient to outweigh New Jersey's policy against forfeiture. *Id.* at 214.

Predicting the substance of state law in the absence of a controlling opinion from that state's highest court is an uncomfortable consequence of our diversity jurisdiction. Such speculation intrudes "on the lawmaking function of that state court," and creates a "fundamental incompatibility . . . with the most basic principles of federalism" because "judges who are not selected under the state's system and who are not answerable to its constituency are undertaking an inherent

36

state court function." Dolores K. Sloviter, *A Federal Judge Views Diversity Jurisdiction Through the Lens of Federalism,* 78 Va. L. Rev. 1671, 1682, 1687 (1992). Our discomfort is compounded here because the Supreme Court of Pennsylvania has "affirmed [its] reticence to throw aside clear contractual language based on the often formless face of public policy." *Heller*, 32 A.3d at 1220 (quotation marks omitted).

Global suggests that we can minimize the strains on federalism that an "*Erie* guess"[10] would cause by simply inverting the usual order of the choice-of-law analysis in those cases where the guesses themselves are ultimately unnecessary because the analysis calls for the application of another state's well-settled law. We cannot, however, conduct a proper choice-of-law analysis without forming some prediction of a candidate state's law and its interest in having that law apply. Given our review of Pennsylvania law and our precedent, we assume without deciding, solely for the sake of our choice-of-law analysis, that Pennsylvania would apply a must-show-prejudice rule to reinsurance contracts, even when the contract makes the notice provision an express condition precedent to coverage.

### D.  Which State's Law Applies?

Given our assumption about Pennsylvania law, we are confronted with a true conflict. Applying a must-show-prejudice rule would promote Pennsylvania's assumed interest in protecting its reinsureds from losing coverage that they have already paid for in the absence of a sound reason for doing so. In contrast, applying New York law here would promote its interest in protecting sophisticated business

---

[10] *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (holding that substantive state law applies in diversity cases).

parties' freedom to enter into contracts without having their terms disregarded or rewritten by courts. In this context, applying one state's law would impair the interests of the other, and there is a true conflict.

Because we assume a true conflict exists, we "determine which state has the greater interest in the application of its law." *Hammersmith*, 480 F.3d at 231 (quotation marks omitted). To do so, we use a methodology that combines the approaches of the *Restatement (Second) of Conflicts of Law* and governmental interest analysis. *Id.* We begin "the analysis by assessing each state's contacts under the Second Restatement," and "turn to § 188(2) (the general provision governing contracts), which directs us to take the following contacts into account: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* at 232-33.[11] This requires "more than a mere counting of contacts." *Id.* at 231 (quotation marks omitted). Instead, "we must weigh the contacts on a qualitative scale according to the policies and interests underlying the particular issue." *Id.* (quotation marks omitted).

Here, the precise place of contracting is somewhat unclear, but New York certainly had a more significant relationship to the Certificate's formation than Pennsylvania did, given that Pennsylvania had no relationship whatsoever in 1980. "[T]he place of contracting is the place where . . . the last act necessary, under the forum's rules of offer and acceptance, [occurred] to give the contract binding effect . . . ." *Restatement (Second) of Conflicts of Law* § 188

---

[11] PEIC concedes that § 188 is the proper section of the *Restatement* to consider. *See* PEIC Br. 30.

cmt. e. Insurance contracts often designate that place as the place of delivery *Crawford v. Manhattan Life Ins. Co. of N.Y.*, 221 A.2d 877,880 (Pa. Super. Ct. 1966). Here, Constitution delivered the Certificate to PEIC's broker in Minnesota, but the parties do not address whether delivery was in fact the last act necessary.[12] The District Court found that offer and acceptance became complete in New York when Constitution confirmed by cable dated June 5, 1980, its agreement to participate for 25% of the $4 million excess layer. Thus, "the place of contract formation was New York," which "PEIC concedes . . . is arguably the case." 2011 WL 2003359, at *9.

There were no meaningful negotiations concerning the Certificate. PEIC's Minnesota broker exchanged telexes with Constitution in New York, but the terms and conditions were never in dispute. Thus, it is difficult to speak at all of a "place of negotiation."

Both possible places of performance that we discussed in *Hammersmith* — "where the premiums are received" and "the state in which notice should have been provided" — point to New York. 480 F.3d at 234, 234 n.13. In this case, Buffalo Forge sent its premiums under the Excess Policy to

---

[12] For example, the Court of Appeals of New York has explained that in "the London market — the Mecca of the reinsurance world," an exchange of telexes constitutes a binding agreement, and "[d]elivery of the original insurance policy to the reinsurer and issuance by the latter of a formal certificate of reinsurance may not occur until much later, and indeed are technically unnecessary for a binding agreement." *Sumitomo Marine & Fire Ins. Co., Ltd.-U.S. Branch v. Cologne Reinsurance Co. of Am.*, 552 N.E.2d 139, 142 (N.Y. 1990).

PEIC's broker in Minnesota, which then sent Constitution in New York its share under the Certificate. As for "the state in which notice should have been provided," notice is due where the entity to be notified is located, which in this case is, and has always been, New York. *Id.* at 234. For our purposes, it is the place of performance.

The subject matter of the Certificate, a contract of indemnity, is PEIC's liability to Buffalo Forge. It is difficult to pinpoint an actual "location" for such an abstract subject matter. To the extent it is located anywhere, an insurer's liability on a policy simply shares a location with the insurer itself. In that context, the location of the subject matter of the Certificate is the same as the location of PEIC.

Turning to the location of the parties, we reiterate that while PEIC is now a Pennsylvania corporation domiciled in Pennsylvania, it was a California stock insurance company located in Los Angeles when the Certificate was issued in 1980. PEIC only became a Pennsylvania insurance company in 1999. In contrast, Constitution was (and Global is) a New York corporation domiciled in New York.

Having identified the contacts that § 188 deems important, we calibrate our qualitative scale to ensure that we weigh the contacts according to the policies and interests underlying the particular issue before us. *Id.* at 231. According to PEIC, "the issue at hand is the nature of the obligations imposed by the contract rather than the validity of the contract." PEIC Br. 34 (quotations and alterations omitted). The opposite is in fact true. We have already decided much of the nature of the relevant obligation imposed, namely Paragraph D's DSOL provision. We have decided when that obligation arises and whether it qualifies as a condition precedent to coverage or as something else, and

40

we have done so without first conducting a choice-of-law analysis because the basic rules of interpretation do not differ between New York and Pennsylvania.  What is before us is whether a prompt notice provision that is expressly stated as a condition precedent to coverage is valid and enforceable as written.

With this mind, we acknowledge that the *Restatement (Second)* instructs courts to consider various fundamental principles when conducting a choice-of-law analysis.  *See Restatement (Second) of Conflicts of Law* § 6(2).  When determining which state has the most significant relationship to a contract and the issue concerns the validity of a contractual provision, the protection of the parties' justified expectations is "of considerable importance."  *Id.* at § 188 cmt. b.  This comes as no surprise because "[p]rotection of the justified expectations of the parties is the basic policy underlying the field of contracts."  *Id.* at § 188 cmt. b.  When the validity of a contractual provision is at stake, the parties' expectations should be measured from their vantage point at the time of contracting, because "[p]arties entering a contract will expect at the very least, subject perhaps to rare exceptions, that the provisions of the contract will be binding upon them."  *Id.*  "Their expectations should not be disappointed by application of the local law rule of a state which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied."  *Id.*

When we use the protection of justified expectations to adjust the weight of the contacts discussed above, we are convinced that New York has the most significant relationship to the Certificate.  A New York reinsurer accepted, in New York, the terms and conditions proposed by

41

a Minnesota broker, acting on behalf of the New York underwriting office of a California company located in Los Angeles. At the time, there would have been simply no reason for the parties to expect that Pennsylvania law would govern whether particular provisions of the contract they were entering into were valid as written. Pennsylvania entered the picture, as a matter of pure happenstance, 19 years later when PEIC relocated to Pennsylvania. PEIC has not pointed us to any authority that would justify allowing this unilateral decision to blur our focus on the facts and the protection of the parties' justified expectations at the time of contracting.[13]

Finally, we must consider the "interests and policies that may be validly asserted by each jurisdiction." *Hammersmith*, 480 F.3d at 235 (quotation marks omitted). New York has an interest in protecting the rights of sophisticated parties, particularly New York reinsurers and insurers who operate out of New York offices, to enter into contracts and to have their terms enforced predictably, with administrative ease, and without second guesses from the courts after costly litigation. Our comments in *Hammersmith* about New York's interest in the primary insurance context in

---

[13] Citing our decision in *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167 (3d Cir. 2011), PEIC claims that we should assess the parties' justified expectations about the validity of Paragraph D's DSOL provision at the time when it moved to Pennsylvania. *Amica* holds that when a district court transfers an action *sua sponte* under 28 U.S.C. § 1404(a), the transferor forum's choice-of-law rules travel with the action to the transferee forum. *Id.* at 169-70. It neither says nor implies anything about one party's post-contract move to another jurisdiction changing the parties' justified expectations about the validity of their contract provisions.

having a need-not-show-prejudice rule are also relevant here: "New York has decided that requiring strict compliance with notice provisions is the most effective means of protecting certain interests of insurance carriers. We will not substitute our judgment for that of the New York courts by concluding that a prejudice rule would just as effectively serve these interests." *Id.* at 232 n.12.

Pennsylvania has an interest in ensuring that its cedants receive coverage that they have paid for and that reinsurers avoid "technical escape-hatches" to coverage in the absence of prejudice. The District Court also found that "Pennsylvania has an interest in achieving uniformity in a situation where the ceding company [like PEIC here] has ceded portions of its risk to various reinsurers." 2011 WL 2003359 at *10 (citing *Ario*, 996 A.2d at 596-97). But in this case, having multiple jurisdictions' laws apply to the same risk is an undesirable consequence entirely of PEIC's own doing. PEIC chose to purchase reinsurance from two New York companies, an Illinois company, and a Massachusetts company, rather than four companies from the same jurisdiction.

Ultimately, while both New York and Pennsylvania have interests in applying their law here, PEIC has undermined and lessened Pennsylvania's interests and has failed to persuade us that those interests, even if unimpaired, substantially outweigh the parties' justified expectation that the provisions of their contract would be valid.

In sum, we conclude that New York has the most significant relationship to the Certificate and the greater interest in having its law applied, especially because applying its law would protect the parties' justified expectations at the time of contracting. Thus, New York's law applies and the Certificate's DSOL provision is enforceable as we read it.

43

## V. Whether Genuine Issues of Material Fact Remain

Finally, PEIC argues that even if New York law applies, there are genuine issues of material fact that nonetheless preclude summary judgment. We disagree.

First, we fail to see how, as PEIC suggests, Global possibly waived its right to avoid coverage based on any non-compliance with Paragraph D. According to PEIC, Global had actual and constructive knowledge of the facts it needed to make its DSOL argument by April 2008, but did nothing until October 2009, when it first asserted defenses to coverage and did not even mention late notice or the DSOL. Even if this were true, however, Paragraph L of the Certificate provides that "[t]he terms of this Certificate of Reinsurance shall not be waived or changed except by endorsement issued to form a part hereof, executed by a duly authorized representative of the Reinsurer." PEIC does not suggest that such a formal endorsement occurred here or that this provision of the Certificate is somehow unenforceable. In fact, it does not mention this provision of the Certificate at all.

Although it faults Global for "relying on a non-existent district court finding that PEIC breached the DSOL provision" and asserts that the question of "whether [the DSOL] was breached" precludes summary judgment, *see* PEIC Br. at 45-47, PEIC does not seriously suggest that, if we adopt the District Court's interpretation of Paragraph D (as we do), it promptly provided Global with a DSOL. Recall that Buffalo Forge gave PEIC notice of asbestos-related claims and lawsuits in April 2001. According to PEIC, beginning in October 2005 it asked its broker to keep all its reinsurers informed about the developments in the Buffalo

44

Forge matter throughout PEIC's handling of the claim, but it appears that the broker did not pass the reports on to Global. According to Global, PEIC first told it about Buffalo Forge in April 2008. Even under PEIC's best case scenario, it would not have provided a DSOL until four years after Buffalo Forge notified it of claims or occurrences involving deaths, serious injuries and lawsuits. PEIC points us to no authority that suggests such a lengthy delay was "prompt."

## VI. Conclusion

We reverse the District Court's Final Order and Judgment, and remand with instructions that the Court enter a judgment of non-liability in Global's favor.