NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4688
_____

BRUCE TOLL,

Appellant

v.

LEONARD TANNENBAUM
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cv-07141)
District Judge:  Honorable Eduardo C. Robreno

Submitted Under Third Circuit LAR 34.1(a)
June 24, 2014

BEFORE:  FUENTES, GREENAWAY, JR., and NYGAARD, *Circuit Judges*

(Filed: December 17, 2014)
_____

OPINION[*]
_____

NYGAARD, *Circuit Judge.*

Appellant Bruce Toll builds luxury homes.  He sued his former son-in-law,

Leonard Tannenbaum, over a multi-million dollar business deal gone badly.  Toll alleged

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

that he made an oral agreement with Tannenbaum to personally guarantee loans for one of Tannenbaum's ventures provided that Toll's daughter (and Tannenbaum's wife) share equally in the profits. Toll asked the District Court to enforce this purported oral agreement or, in the alternative, for equitable relief. Applying New York law, the District Court granted summary judgment to Tannenbaum on all of Toll's claims. Toll has appealed and we will affirm.

I.

Tannenbaum married Toll's daughter Elizabeth in 1997 and soon thereafter began doing business with his new father-in-law. Toll agreed to help Tannenbaum start an investment fund and the two agreed to split the profits, with Toll receiving the lion's share. Tannenbaum set up a management company to oversee this fund. The venture was successful and both father-in-law and son-in-law made millions.

Tannenbaum went to his father-in-law again in 2004, this time asking for a $60 million investment in another fund. Toll balked at the $60 million request, agreeing instead to invest $20 million and to personally guarantee a $6.7 million loan to the new fund. Toll did not have a profit sharing arrangement with Tannenbaum in this new venture. Another management company was set up for this fund; a company which again collected management fees from the fund that were directly paid to Tannenbaum.

Tannenbaum again asked Toll to invest in a third fund which was launched in 2007. This venture, Fifth Street Mezzanine Partners, III, L.P., was also an investment fund and was incorporated in Delaware. As he had done previously, Tannenbaum

established a management company, Fifth Street Management LLC, to administer the fund and to collect certain fees. Tannenbaum took this fund public in January of 2008.

Toll played a part in this third business venture by investing $25 million to finance the fund and by guaranteeing a $50 million line of credit to the fund. He also provided a short term "bridge loan" to the fund at an interest rate of 12 percent. Toll further guaranteed $15 million in loans to Tannenbaum personally. The instant litigation grew out of the circumstances surrounding this loan. Toll maintains that his son-in-law asked him to personally guarantee $15 million in loans from Wachovia Bank and that instead of taking a share of the profits, he and Tannenbaum agreed the profits would be equally split between Tannenbaum and his wife, Elizabeth. After several months of discussion, Toll alleges that he and Tannenbaum reached an oral agreement to that effect. This agreement, however, was never reduced to writing.

These Wachovia loans consisted of two promissory notes, one for $12 million, and one for $3 million. When these notes came due in 2009, Tannenbaum still owed the bank $12 million. The bank gave Tannenbaum two options: pay off the balance owed, or have his father-in-law execute another personal guarantee for the remaining $12 million. By his own account, Toll was reluctant to sign another guarantee and asked to be released from the deal. Tannenbaum left him little choice, however, by threatening to default on the loan. Toll signed the second guarantee, he said, to secure Elizabeth's profit sharing position with Tannenbaum.

However, within months of executing this second agreement, Tannenbaum filed for divorce from Elizabeth. As part of the separation agreement, Elizabeth disclaimed

3

any interest in Tannenbaum's businesses and released any and all claims she had against him. Tannenbaum has never shared any profits from his company with Elizabeth. Toll sued, arguing that his now former son-in-law breached their oral agreement to share profits with Elizabeth. However, Toll sought damages only for himself, not on behalf of his daughter. For his part, Tannenbaum maintained that he never reached an oral agreement with his former father-in-law.

## II.

Toll first filed suit in the Montgomery County Court of Common Pleas, raising claims for breach of contract, unjust enrichment, quantum meruit, promissory estoppel, and fraud. Tannenbaum removed the matter to the United States District Court for the Eastern District of Pennsylvania based on diversity jurisdiction and moved to dismiss Toll's complaint.[1] Tannenbaum maintained that the District Court should use New York law to resolve Toll's claims and that, under New York law, Toll's claims should fail because New York does not recognize an oral contract that cannot be performed within one year. The District Court agreed with Tannenbaum that if New York law applied, Toll's claims would be barred by that state's Statute of Frauds. Initially sidestepping the choice of law issues, the District Court granted Tannenbaum's motion and dismissed Toll's breach of contract claim, holding that only Elizabeth Toll-Tannenbaum, the third-

---

[1] Diversity jurisdiction was proper under 28 U.S.C. § 1332 as Toll is a citizen of Florida and Tannenbaum a citizen of Connecticut and the amount in controversy exceeds $75,000.00. We have jurisdiction pursuant to 28 U.S.C. § 1291.

4

party beneficiary, could recover damages. Toll was granted leave, however, to amend his claim to bring a claim for specific performance and associated damages.

Toll filed an amended complaint which again raised claims of breach of contract, unjust enrichment, quantum meruit, estoppel, and fraud. Specifically, Toll asked for damages for the devaluation of his share in Tannenbaum's company and "for the loss of the ability to otherwise invest the money subject to the guaranty." *Toll v. Tannenbaum*, 982 F.Supp.2d 541, 547 (E.D. Pa. 2013). Toll also asked the District Court to compel Tannenbaum to provide 50 percent of Fifth Street Management's past, present and future profits to Elizabeth Toll-Tannenbaum. On his equitable claims, Toll asked for restitution in an amount equal to 90 percent of Fifth Street Management's profits since May of 2007.

Tannenbaum moved for summary judgment, and the pivotal choice-of-law question quickly reasserted itself. Tannenbaum argued that New York law controlled Toll's contract claim. Because Toll's claim was based on an alleged oral contract, it would be barred by that state's Statute of Frauds. Toll countered that Pennsylvania law was applicable and would not prohibit his claim.

The District Court held two hearings on the choice-of-law issues. The first hearing focused on the standard the court should use to resolve disputed factual matters which underlie the choice-of-law question. Because that question is a legal one, the District Court concluded that it, as opposed to a jury, would decide any factual disputes, using a preponderance of the evidence standard. At a subsequent hearing, the District Court reviewed evidence on the factual disputes underlying the choice-of-law inquiry.

5

The District Court granted Tannenbaum summary judgment on all of Toll's claims.

III.

On appeal, Toll challenges the District Court's determination that New York law governs the resolution of his breach of contract claim. He also challenges the District Court's dismissal of his quasi-contract claims. We begin our review with the choice-of-law issue, utilizing plenary review. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007

A.    Choice of Law Determination

Because we are a federal court sitting in diversity, we apply the choice of law rules of the forum state: Pennsylvania. *See, e.g., Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012). Pennsylvania's approach to choice-of-law questions has two steps. First, we must apply Section 188(2) of the Restatement (Second) of Conflict of Laws (1971) to identify the relevant contacts between each state, the parties, and the subject matter. Then, we weigh those contacts according to the policy-oriented factors of Section 6 of the Restatement, discussed below.

Section 188(2) sets forth the contacts we consider: (a) "the place of contracting;" (b) "the place of negotiation of the contract;" (c) "the place of performance;" (d) "the location of the subject matter of the contract," and (e) "the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* Toll's challenge to the choice-of-law determination is narrowly focused. He does not, for example, argue that there is no conflict between Pennsylvania and New York law on the

6

question of oral contracts. Nor could he because New York and Pennsylvania laws are polar opposites as they pertain to oral contracts: New York's statute of frauds invalidates oral contracts that cannot be performed in a year where Pennsylvania has no such limitation.[2] *Compare* N.Y. Gen. Oblig. Law § 5-701(a)(1) (2014), *with* 33 Pa. Cons. Stat. §§ 1-6 (2011). Toll does not fault the District Court's use of the Restatement (Second) of Conflicts §6 to determine which state has the greater interest in seeing its laws enforced. Lastly, Toll accepts the procedure used by the District Court to resolve factual disputes as they relate to the choice-of-law determination. Instead, Toll hones his challenge to two points of the choice-of-law analysis undertaken by the District Court: the "most significant relationship" inquiry, and the "relative inquiries and policies" determination.

The District Court, in going through the above factors, concluded that it was a wash. The analysis did not conclusively point to either New York or Pennsylvania as the applicable law, in part because there was conflicting evidence as to whether the alleged oral contract was agreed. Our review confirms that determination. Toll himself concedes that several of the Restatement factors are of little importance (the place of negotiation, for example) and Toll does not argue on appeal the importance of other factors (the place of negotiation and the parties' domicile and residence, to name two).

We further agree with the District Court that the place of performance is entitled to little weight because, without more, perceived performance in Pennsylvania cancels out

---

[2] Toll does not contest that the alleged oral contract between him and Tannenbaum could not be performed within a year. Any such oral agreement would, therefore, be void under New York Law.

7

perceived performance in New York. This leaves Toll's argument that because the place of contracting was so clearly Pennsylvania, the Commonwealth's laws should apply. He submits that the District Court should have ended its inquiry and analysis on this point alone. Again, we agree with the District Court that, assuming Pennsylvania was the location of contracting, that factor alone has little significance in the overall scheme of things. The commentary to § 188 of the Restatement clarifies the importance of the place of contracting among the factors relevant to the choice of law analysis:

> *Standing alone, the place of contracting is a relatively insignificant contact*. To be sure, in the absence of an effective choice of law by the parties, issues involving the validity of a contract will, in perhaps the majority of situations, be determined in accordance with the local law of the state of contracting. In such situations, however, this state will be the state of the applicable law for reasons additional to the fact that it happens to be the place where occurred the last act necessary to give the contract binding effect. The place of contracting, in other words, rarely stands alone and, almost invariably, is but one of several contacts in the state.

Restatement (Second) of Conflicts of Laws § 188, cmt. e (emphasis added). The place of contracting could have easily been New York, or any of the several other states in which Toll spends time. He testified to his desire to spend more time each year in Florida, for example, where he has his primary residence and pays taxes. Indeed, the record here shows that Toll spends only 25 percent of his time in Pennsylvania. Because the evidence is indeterminate on the place of contracting, and because this factor is "a relatively insignificant contact," the place of contracting here adds little, if anything, to the choice-of-law determination.

8

Toll argues that the guaranty he gave to the Wachovia Bank loan bolsters his connections with Pennsylvania. This argument is a distraction. Our focus for the choice-of-law question, Tannenbaum rightly points out, is not the formation of the Wachovia loan, but rather the circumstances surrounding the formation of the purported oral agreement. The Wachovia loans Toll references are distinct written agreements between Tannenbaum and the bank. We cannot see how these agreements, to which Toll was not even a party, tip the balance in favor of Pennsylvania in the choice-of-law analysis.[3] An analysis of the choice-of-law factors, as the District Court found, does not conclusively point to either New York or Pennsylvania law. We must, therefore, shift our analysis to the relative interests and policies of each jurisdiction. *See Blakesley v. Wolford*, 789 F.2d 236, 238-39 (3d Cir. 1986); *see also* Restatement (Second) of Conflict of Laws § 188(1) (1971) (requiring a court to consider the Section 188(2) contacts in light of the policies

---

[3] Toll also argues on appeal that the District Court inappropriately changed some of its choice-of-law factual conclusions at summary judgment from those it relied on to decide Tannenbaum's motion to dismiss. Any such change is quite permissible and stems not from a judge's caprice or disregard for the actual facts, but instead from the change in the legal standards to be applied. When reviewing a motion to dismiss, a district court is required to accept all allegations pleaded in the complaint as true and to confine its analysis to those averments. *See Great W. Mining & Mineral Co. v. Fox Rothschild, LLP,* 615 F.3d 159, 177 (3d Cir. 2010) (quotations omitted). Any inferences drawn from the complaint are to be in the plaintiff's favor. *Foglia v. Renal Ventures Management, LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). There is a significant difference between the standard of review and the procedural posture for a motion to dismiss and that for a motion for summary judgment. At the summary judgment stage, the parties have engaged in discovery and may present a complete factual record to the court. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772-73 (3d Cir. 2013). At summary judgment, some important facts differed in how they were presented in the complaint. For example, Toll's complaint stated that the negotiations took place in Pennsylvania. A different picture emerged after the completion of discovery where Toll testified that the negotiations took place in several locations and were not just limited to the Commonwealth. The District Court acted properly and we find no error.

identified in Section 6). Among the factors a court may consider are: (a) "the needs of the interstate and international systems;" (b) "the relevant policies of the forum;" (c) "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;" (d) "the protection of justified expectations;" (e) "the basic policies underlying the particular field of law;" (f) "certainty, predictability and uniformity of result;" and (g) "the ease in the determination and application of the law to be applied." Restatement (Second) of Conflicts of Laws § 6(2) (1971).

No one disputes that Pennsylvania and New York's laws conflict on oral contracts and that each state has an interest in seeing its own laws enforced. Toll argues that Pennsylvania's interests in permitting oral agreements are paramount, and that the District Court erred by applying New York law: not so. New York's interests in prohibiting oral contracts are more compelling.

First, New York law better fits the expectations of the parties. The District Court determined that because the parties selected New York law when they formalized other agreements based on the same subject matter, "they could reasonably and justifiably expect New York law to apply to other agreements as well." *Toll*, 982 F. Supp. 2d at 556. We agree. Toll and Tannenbaum chose New York law when they wrote up the $50 million loan guaranty fee agreement. Furthermore, the record contains testimony that New York law was always invoked in agreements drafted by Tannenbaum's representatives and that Toll signed those agreements without objection. Toll, therefore, should not be surprised to learn that New York law applies to his claims.

Next, we consider certainty, predictability, and uniformity of result. Like New York, most jurisdictions in this country require that parties memorialize all contracts of definite duration that cannot be completed within one year. *See* Restatement (Second) of Contracts § 130 (1981) (and cases cited therein). Pennsylvania is in the distinct minority. Thus, we think that to promote certainty, predictability, and uniformity of result, New York law should apply here.

Next, the basic policies underlying the particular field of law, contract law here, should be reviewed. Contract jurisprudence contains several policies which favor written instruments over oral agreements. Reducing an agreement to writing not only prevents fraud and perjury but also can prevent courtroom errors that might arise due to the fallibility of human memory or the unavailability of witnesses. Furthermore, requiring written contracts ensures that the parties act with caution and deliberation. Lastly, by requiring written agreements, the parties are further compelled to set out in one document all of the material terms and conditions to their agreement. This, therefore, can avert any future disputes and litigation. In short, major policies underlying contract law favor the application of New York law.

So, taking into consideration the factors outlined in Section 6, applying New York law makes the most sense. In our view, the policies underlying New York's Statute of Frauds trump any interest Pennsylvania may have here in protecting Toll as he attempts to enforce an oral agreement.[4] New York law will not only protect the justified

---

[4] Again, Toll points to the District Court's initial determination that New York policy interests in requiring written contracts were diminished when compared against

11

expectations of the parties, but will also advance the relevant policies of that state. Further, using New York law to resolve this dispute will promote predictability and advance basic policies underlying contract law.

Toll has consistently acknowledged that his agreement with his former son-in-law was never reduced to writing and that its terms would not permit performance within one year of its inception. Therefore, under New York law, any such agreement is void. The District Court committed no error by granting Tannenbaum summary judgment on Toll's breach of contract claim.

## B. The Quasi-Contract Claims

Toll also attempts to recover compensation on the legal principles of restitution, quantum meruit, and unjust enrichment, all of which sound in quasi contract.[5] Claims for

---

Pennsylvania's and the District Court wrongly changed its thinking post-discovery on summary judgment. And again, we note that the District Court was obligated to limit its thinking to the allegations set out in the complaint, giving every favorable inference to Toll. One such allegation was that "in discussions occurring in Montgomery County, Pennsylvania, there was a meeting of the minds between Toll and Tannenbaum as to the terms of their agreement." *Toll*, 982 F.Suppp.2d at 555. The District Court, based on this allegation, cannot be faulted for believing that Tannenbaum "reached into Pennsylvania to negotiate and complete the alleged contract." *Id*. This is not the picture that emerged after discovery, however, wherein Toll testified that the negotiations with his son-in-law took place in a variety of locales, and that maybe only one business discussion took place in Montgomery County. Also, Toll changed his story, indicating that the final meeting of the minds took place over the telephone – not in person in Montgomery County. Given these circumstances, the District Court could no longer hold that Tannenbaum "reached into" Pennsylvania and that, as a result, New York's interests were diminished. This was not an error, but an evaluation made at a different stage of the litigation and with a vastly expanded record and a vastly expanded point-of-view for the District Court.

[5] The District Court also found that Toll's claim based on promissory estoppel was unfounded and Toll has not appealed this determination.

12

quantum meruit and unjust enrichment have been analyzed as a single claim under New York law. [6] *See, e.g., Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (analyzing the two causes of action "as a single quasi contract claim").  Unjust enrichment in New York is established where a plaintiff demonstrates (1) "that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006).  Similarly, to recover in quantum meruit under New York law, Toll must establish:  "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefore, and (4) the reasonable value of the services."  *Mid–Hudson Catskill*, 418 F.3d at 175 (internal quotation marks omitted).

We do not need to delve deeply into the elements of each claim or determine their overlap to affirm the District Court's conclusion that Toll was not entitled to relief.  As to

---

[6] We follow the Restatement (Second) of Conflicts of Laws, which counsels that when reviewing claims based on quasi-contract theory, we look to:  "(a) the place where the parties' relationship was centered; (b) the state where defendants received the alleged benefit or enrichment; (c) the location where the act bestowing the enrichment or benefit was done; (d) the parties' domicile, residence, place of business, and place of incorporation; and (e) the jurisdiction "where a physical thing ..., which was substantially related to the enrichment, was situated at the time of the enrichment."  *Id*. § 221(2) (1971).  Like the District Court, we find these contacts reminiscent of those we used to determine which state's law applies to Toll's breach of contract claim.  Inasmuch as we applied New York law to that claim, we will do so again to these claims.  We note further that the District Court did the same.  Toll points out in his brief that if we were to decide that Pennsylvania law controls the breach of contract claim, and apply that law to these equitable claims, the quantum meruit analysis would be a bit different, excluding any analysis of his reasonable expectation of compensation.  That, however, is not an argument that New York law should not apply to these claims.  We do not see either party as raising a specific objection to the application of New York law to the quasi-contract claims on appeal and will apply that state's law accordingly.

13

Toll's claim for unjust enrichment, the District Court focused on the question of whether equity and good conscience required that Toll receive restitution. We agree with the District Court that Toll suffered no inequity and therefore has no claim for unjust enrichment or quantum meruit. Toll provided loan guarantees because, he alleges, Tannenbaum agreed to share half the profits with Toll's daughter--not with Toll himself. Toll also admits to advising his daughter on her divorce settlement, which disclaimed any actions against Tannenbaum and/or his company. In other words, he seeks restitution for himself even though his daughter has relinquished her claims. Therefore, we see no inequity. Also, Toll did receive a benefit from guaranteeing the loans: his guarantee helped attract other investors to Tannenbaum's fund--a fund in which Toll was a major investor. Because Toll has rendered a service from which he received a benefit, there is no inequity to compensate. Furthermore, Toll suffered no injury by guaranteeing the loans to Tannenbaum. Tannenbaum never defaulted on the loans and Toll himself testified that in making the loan guarantees, he had neither out-of-pocket expense nor lost investment opportunity as a result of making these loan guarantees. And, the record reveals that Toll had provided loan guarantees for Tannenbaum before without asking for any compensation. We see no inequity and the District Court correctly granted summary judgment to Tannenbaum on these claims.

Toll fares no better under quantum meruit. First, Toll did not seek recovery for the value of services he rendered to Tannenbaum. Toll admits on the record that he never expected to be compensated directly for providing the loan guarantees, but that his daughter, Elizabeth, would receive investment fund profits instead. Toll calls our

14

attention to other loan guarantees he made on behalf of Tannenbaum's business, but in those situations Toll himself received direct compensation for himself and not a third party. We agree with the District Court's analysis which concluded that Toll offered no evidence that he expected compensation prior to the performance of his services.

The District Court also faulted Toll for not alleging damages that could have been recoverable under quasi-contract theory. Toll asked for damages for the reasonable value of the interest he would have had in Tannenbaum's company had his son-in-law not promised Elizabeth half the profits. The District Court found this request incompatible with unjust enrichment as it was based on the existence of a contract. We agree. Toll does not take issue with the District Court's analysis, but instead argues that he should have been permitted to amend his complaint post-summary judgment so as to allege appropriate damages, this even though Toll never asked the District Court for such leave.

Toll's arguments here are unavailing and we see no error. First, Toll bears the responsibility of moving to amend his complaint under FED.R.CIV.P. 15; it is not the District Court's task to encourage any such amendment. That Toll may have changed his theory of recovery more than a year before Tannenbaum's summary judgment motion was filed does not change the fact that Toll's complaint needed amending in order to reflect that change in legal theory. Additionally, Toll's argument that the District Court would have freely granted him leave to file an amended complaint is not convincing. This decision is within the discretion of the District Court, Lake v. Arnold, 232 F..3d 360, 373 (3d Cir. 2014),  and we find no abuse of that discretion here. Toll's quasi-contract claims had been found lacking for various reasons that stand independent from the

15

question of appropriate damages. Any amendment was likely futile and would have caused undue delay here.

In sum, none of Toll's claims for quasi-contract relief are meritorious and the District Court did not err by granting summary judgment to Toll.

## IV. Conclusion

In summary, New York law applies to Toll's breach of contract claim. Therefore, the District Court correctly granted summary judgment to Tannenbaum because the alleged oral contract could not be performed, by Toll's own admission, within one year of its making. Further, Toll's claims under quasi-contract theory are meritless and the District Court rightly granted summary judgment to Tannenbaum. We have considered all issues that were raised by Appellant and find no merit to any of them. We will, therefore, affirm the decision of the District Court.

16